*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0828**

Noelle Erling,
Relator,

vs.

Wells Fargo Bank, N.A.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed March 2, 2026**
**Affirmed**
**Smith, Tracy M., Judge**

Department of Employment and Economic Development
File No. 51190684

Daniel J. Wilcox, Trautmann Martin Law PLLC, St. Paul, Minnesota (for relator)

Sara L. Lewenstein, Nilan Johnson Lewis PA, Minneapolis, Minnesota (for respondent Wells Fargo Bank, N.A.)

Melannie Markham, Keri A. Phillips, Katrina Gulstad, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

        Considered and decided by Harris, Presiding Judge; Smith, Tracy M., Judge; and

Segal, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**SMITH, TRACY M.**, Judge

Relator Noelle Erling challenges an unemployment-law judge's (ULJ) determination that her filing of a false compliance form constituted employment misconduct, rendering her ineligible for unemployment benefits. She argues that (1) the ULJ's findings are not supported by substantial evidence; (2) even accepting the findings, her conduct did not rise to the level of employment misconduct; and (3) the ULJ erred by denying relief on her request for reconsideration. We affirm.

## FACTS

Erling worked as a lending operations manager for Wells Fargo from 2009 until the termination of her employment in November 2024. After she was discharged, Erling filed for unemployment benefits with respondent Minnesota Department of Employment and Economic Development (DEED) and initially was determined eligible for unemployment benefits. Wells Fargo appealed, arguing that Erling had been discharged for employment misconduct and was therefore ineligible for employment benefits. A hearing was held before a ULJ. Two witnesses testified: N.C., a planning operations director for Wells Fargo; and Erling.

N.C. testified that, as part of Wells Fargo's "control and major compliance requirements," managers are required to go through a monthly "Greenlight inspection" with their direct reports. The Greenlight inspection is a series of yes or no questions that are provided to managers and that managers must ask their direct reports during a one-on-one meeting. Managers must "submit and publish" an electronic attestation that they

2

completed the Greenlight inspection. Erling was a manager and supervised an employee, T.; by the end of each month, she was required to ask T. the Greenlight inspection questions and attest that the questions were completed.

N.C. testified that, at the end of July 2024, Wells Fargo Business Execution Consultant T.R. conducted a compliance inspection. Electronic records showed that on July 30, 2024, Erling submitted an attestation that she had completed the Greenlight inspection for July with T. On July 31, T.R. talked to T., who reported that he and Erling had meant to meet to complete the Greenlight inspection for July but they did not. Subsequent investigation of the incident led to Erling's discharge in November.

N.C. testified that the Greenlight inspection is part of Wells Fargo's record system for risk and compliance requirements and that false attestation is a violation of Wells Fargo policy. In response to a question from the ULJ, N.C. stated that Erling was "on final notice for conduct from 2019" when Erling was reprimanded for recording a conversation between herself and another manager in violation of Wells Fargo's policy.

Erling testified that the Greenlight inspection process required her to "meet with each employee and review the questions and then go into the system to attest that we have reviewed the information with the employee." Erling testified that, due to system time-out issues, "it wasn't uncommon for an attestation to either go in at the beginning when you met with them so the system didn't time out or put in an attestation at the end of the day or end of the week even, you know, stating when it was completed." Erling testified that N.C. was aware that sometimes managers would put in their attestation at the beginning of a meeting.

3

As for the July 2024 events with T., Erling stated that she had returned from time off the week before the end of July and had to get her month-end tasks completed "kind of quickly." Erling met with T. on July 29 for a regular one-on-one meeting, in which Erling intended to complete the Greenlight inspection, but they instead worked on an urgent client closing issue into the evening. Erling testified that, "because this was such an escalated situation, [the closing issue] would definitely have taken precedence over us working through a Greenlight attestation." Erling testified that she and T. met the next day, July 30, but they were still working on the client issue. Erling testified that she did not remember exactly what occurred and that she could have forgotten to complete the Greenlight questions with T. and that she "must have made a mistake somewhere along the way." She did not deny submitting an attestation that she had completed the Greenlight inspection with T.

Erling testified that she had never had an issue with the Greenlight process before this incident and that she had been asked to train new managers on the Greenlight inspection process that summer. In response to the ULJ's questions about Erling's typical Greenlight-inspection process, Erling stated that she typically sent an email to the employee with the attestation number after she had met with the employee but she no longer had access to her Wells Fargo emails to confirm whether she had sent an email to T. confirming their end-of-July meeting.

After the hearing, the ULJ found that Erling had been discharged for employment misconduct and ordered her to repay $8,226 in unemployment benefits she had previously received. Erling filed a request for reconsideration. The reviewing ULJ affirmed the

4

decision, determining that Erling had not submitted evidence that would likely change the outcome or require an evidentiary hearing.

This certiorari appeal follows.

## DECISION

Erling argues that (1) the ULJ's findings are not supported by substantial evidence, (2) alternatively, even accepting the ULJ's findings, Erling's actions did not constitute employment misconduct, and (3) the ULJ erred in denying relief on Erling's request for consideration. We address each argument in turn.

## I. The ULJ's findings are supported by substantial evidence.

Erling argues that substantial evidence does not support the ULJ's findings regarding Erling's actions and Wells Fargo's reasonable expectations and standard practices.

Under Minnesota Statutes section 268.105, subdivision 7(d)(5) (2024), an appellate court may reverse or modify a ULJ's decision "if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion, or decision are . . . unsupported by substantial evidence." The appellate court reviews the ULJ's factual findings in the light most favorable to the decision, giving deference to the ULJ's credibility determinations. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). "Whether the employee committed a particular act is a question of fact." *Id.* A ULJ's credibility determination must be supported by substantial evidence. *Wichmann v. Travalia & U.S. Directives, Inc.*, 729 N.W.2d 23, 29 (Minn. App. 2007).

"An unemployment law judge may only use reliable, probative, and substantial evidence as a basis for decision." Minn. R. 3310.2922 (2023). A ULJ is not required to conform to the rules of evidence and "may receive any evidence that possesses probative value, including hearsay." *Id.* As a result, "[a] witness at an evidentiary hearing is not required to have firsthand knowledge." *Skarhus*, 721 N.W.2d at 345. "When the credibility of a witness testifying in a hearing has a significant effect on the outcome of a decision, the unemployment law judge must set out the reason for crediting or discrediting that testimony." Minn. Stat. § 268.105, subd. 1a(a) (2024). An appellate court "will uphold a ULJ's credibility determinations if supported by substantial evidence." *Wichmann*, 729 N.W.2d at 29.

## A.    Erling's Actions

Erling takes issue with three findings in the ULJ's decision regarding Erling's actions: (1) "On July 30, 2024, Erling signed the attestation form, even though she had not yet met with [T.] and reviewed the questions," (2) the investigator "learned that [T.] and Erling never met or discussed" the Greenlight inspection questions, and (3) "Erling testified that she signed the attestation before meeting with [T.] but never reviewed the questions with him."

Regarding the first and second findings that Erling challenges, Erling focuses on the word "met," arguing that she and T. did in fact "meet" multiple times. But the crucial part of the ULJ's findings is that Erling and T. never "reviewed the questions" and never "discussed" the questions, and that finding is supported by the record. Erling testified, "I didn't forget to meet with him. I did meet with him and I think I met with him twice. Did

6

I forget to finish the attestation? Yeah, I could have very well forgotten." Erling also testified that she would sometimes attest at the beginning of the meeting with an employee, before asking the Greenlight inspection questions. In addition, N.C. testified that the investigation revealed that Erling had attested but had never completed the questions with T. Erling challenges N.C.'s testimony as "double hearsay" because N.C. testified as to what T.R. said T. said. But the rules of evidence do not apply to unemployment hearings, and N.C.'s testimony need not have been excluded by the ULJ if it was probative. *See Skarhus*, 721 N.W.2d at 345; Minn. Stat. § 268.105, subd. 1a(a). We conclude that N.C.'s and Erling's testimonies provide substantial evidence to support the first and second findings that she signed the attestation without having met with T. *and* without having reviewed the Greenlight inspection questions.

We turn to the third factual finding that Erling challenges: "Erling testified that she signed the attestation before meeting with [T.]" Erling contends that this finding is false because she never testified that she signed the attestation before "meeting" with T. It is true that Erling never testified that she signed the attestation before "meeting" with T.—in fact, she testified that she met with T. on July 30. But her argument that the error requires reversal is not convincing.

Erling contends that the error requires reversal because it led the ULJ to find her testimony not credible. When witness credibility has a significant effect on the outcome, a ULJ is required to set out the reason for crediting or discrediting testimony. *See* Minn. Stat. § 268.105, subd. 1a(a). The ULJ found:

7

> The findings of fact are based on [N.C.'s] testimony. Her testimony was credible because it was detailed and specific. In her written answers to questions, Erling's testimony was not credible because it was inconsistent. In her written answers, she stated that her review with [T.] was interrupted by the closing and her attestation was a simple "mistake." Erling testified that she signed the attestation before meeting with [T.] but never reviewed the questions with him. Accordingly, the findings of fact are based on [N.C.'s] testimony.

We do not doubt that the credibility of the witnesses was critical to the ULJ's determination. But Erling urges an extremely literal interpretation of the ULJ's credibility finding. For the reasons discussed above, in context the ULJ was likely referring to Erling signing the attestation before meeting with T. on the topic of the Greenlight inspection—not simply before any "meeting" with the employee. Moreover, there were other inconsistencies in Erling's testimony—her testimony was often contradictory and unclear. In any event, if the finding contained a misstatement, an unsupported finding or slight factual inaccuracy does not require relief so long as the findings necessary for a legal conclusion are adequately supported. *See Hanka v. Pogatchnik*, 276 N.W.2d 633, 636 (Minn. 1979) (holding that if the findings necessary for a legal conclusion are adequately supported, a court's inclusion of other unsupported findings is harmless error). The ULJ explicitly found that N.C.'s testimony was credible because her testimony was "detailed and specific." That credibility determination is supported by substantial evidence, and, as a result, any minor misstatement in characterizing Erling's testimony did not prejudice her substantial rights. *See Skarhus*, 721 N.W.2d at 344.

8

### B. Wells Fargo's Expectations and Practices

Erling also argues that the ULJ made "virtually no findings" on the issue of Wells Fargo's actual practices and whether Wells Fargo could reasonably expect strict compliance given those practices. We note for clarity that, while this argument involves similar facts as the argument addressed in Section II below regarding our de novo review of whether Erling's actions constituted employment misconduct, Erling's argument here asserts that the ULJ's finding that Erling violated employer policy is unsupported by substantial evidence because there are no findings on what Wells Fargo's actual practices were.

At the hearing, N.C. testified about Wells Fargo's policy for the Greenlight inspections, stating that managers and their direct reports "were required to meet and complete [the Greenlight questions] prior to the attestation." N.C. stated that employees were "not supposed to" complete the attestation before asking the questions of their direct reports, though she alluded to managers perhaps putting in the attestation "at the same time" as performing an inspection.

Erling contends that managers attesting before asking the Greenlight questions was an accepted practice due to a system time-out issue. Erling testified, "[N.C.] herself was a part of many conversations that didn't follow that playbook along this process. And it was known that we would put in, you know, our attestation at the beginning." Additionally, Erling stated, "[T]his was a process that myself and most of, if not all of [N.C.'s] employees, managers were doing when they put in the attestations. That we would get on

the phone with them, plug it in so that it didn't, the system didn't time out and then do our attestation."

The ULJ's findings do not specifically address whether other managers completed attestations before completing Greenlight inspections, despite Wells Fargo's policy. But we have held that an employer's alleged failure to enforce its own rules against other employees is not a defense to a determination of employment misconduct. *Sivertson v. Sims Sec., Inc.*, 390 N.W.2d 868, 871 (Minn. App. 1986), *rev. denied* (Minn. Aug. 20, 1986). Here, the ULJ may not have included a finding as to whether other managers ever made attestations before completing a Greenlight inspection either because it is immaterial or because the ULJ did not find Erling's testimony about others' practices credible. In any event, the ULJ did not fail to make necessary findings about Wells Fargo's expectations and practices.

## II. Erling's attestation that she completed a Greenlight inspection when she had not completed it constitutes employment misconduct.

Erling argues that, even if we accept the ULJ's findings, Erling's conduct does not rise to the level of employment misconduct.

An employee discharged for employment misconduct generally is not eligible for unemployment benefits. Minn. Stat. § 268.095, subd. 4 (2024). "Whether an employee committed employment misconduct is a mixed question of fact and law. . . . But whether the act committed by the employee constitutes employment misconduct is a question of law" that this court reviews de novo. *Skarhus*, 721 N.W.2d at 344.

10

Minnesota Statutes section 268.095, subdivision 6(a) (2024), defines employment misconduct as "any intentional, negligent, or indifferent conduct, on the job or off the job, that is a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." The statute further provides that, regardless of the definition provided in subdivision 6(a), conduct "that was a consequence of the applicant's inefficiency or inadvertence," was "conduct an average reasonable employee would have engaged in under the circumstances," or was a "good faith error[] in judgment if judgment was required" is not employment misconduct. Minn. Stat. § 268.095, subd. 6(b)(2), (4), (6) (2024). The statute also provides that, "[i]f the conduct for which the applicant was discharged involved only a single incident, that is an important fact that must be considered in deciding whether the conduct rises to the level of employment misconduct." *Id.*, subd. 6(d) (2024). But "[a] single incident can constitute misconduct when an employee deliberately chooses a course of conduct that is adverse to the employer." *Schmidgall v. FilmTec Corp*, 644 N.W.2d 801, 806 (Minn. 2002).

Erling first argues that her conduct was not employment misconduct because it was inadvertent. She asserts that she intended to complete the Greenlight inspection, had scheduled a meeting with T. intending to do so, and was interrupted by a closing issue with an urgent deadline. DEED counters that Erling would have committed employment misconduct even if she *had* subsequently completed the questions with T. because the intentional misconduct occurred when Erling attested to having completed the Greenlight inspection without first asking the Greenlight questions. We agree with DEED. While the fact that T. said that he and Erling meant to meet to complete the inspection suggests

11

inadvertence in failing to complete the inspection, it does not suggest inadvertence regarding the attestation. Erling's misconduct occurred when she falsely attested that she had completed the Greenlight questions. And regardless of other employees' practices, "[v]iolation of an employer's rules by other employees is not a valid defense to a claim of misconduct." *Dean v. Allied Aviation Fueling Co.*, 381 N.W.2d 80, 83 (Minn. App. 1986).

Erling next argues that a reasonable employee would have taken the same action as she did—forgoing the "routine monthly paperwork that could theoretically be finished later" in favor of helping to complete a client closing. She also argues that that decision was at most a good faith error in judgment. But the question is not whether a reasonable employee would postpone the Greenlight inspection in favor of other work, it is whether an employee's attestation falsely stating that the Greenlight inspection was completed constituted employment misconduct. That is not reasonable or an error in judgment.

Erling nevertheless contends that submitting the untrue attestation was not a serious violation of the standards of behavior that Wells Fargo had the right to expect. *See* Minn. Stat. § 268.095, subd. 6(a). She also suggests that the action of submitting an attestation before performing an inspection is justified by the system sometimes timing out. DEED counters that the system timing-out issue was not a significant or unreasonable burden that excuses Erling's failure to follow Wells Fargo's required procedures and that Erling's violation was serious and intentional because compliance in the banking industry is essential, and Erling testified that she was aware of Wells Fargo's policy. DEED's argument is persuasive.

Finally, Erling argues that her actions should not be considered employment misconduct because they involved a single incident and the mistake was mitigated by her 15-year employment history and the work emergency that she faced.[1] But the ULJ did not abuse its discretion by not finding that the work emergency that Erling faced justified submitting an untrue attestation. Nor did it abuse its discretion by finding that Erling's attestation was not a mistake. Accordingly, we conclude that the ULJ did not err by determining that Erling's actions constituted employment misconduct.

### III. The ULJ did not err by denying relief on Erling's request for reconsideration.

Erling argues that the ULJ's affirmation order ignores the mistakes that she identified in her request for reconsideration and that the ULJ erred by not correcting the errors or ordering an additional hearing to receive further evidence.

Upon a request for reconsideration, a reviewing ULJ may "correct any factual or legal mistake in the decision" or "order an additional hearing when appropriate." Minn. Stat. § 268.105, subd. 2(b)(1) (2024). An appellate court reviews a ULJ's decision to deny an additional evidentiary hearing for an abuse of discretion. *Kelly v. Ambassador Press, Inc.*, 792 N.W.2d 103, 104 (Minn. App. 2010). On a request for reconsideration,

> [t]he unemployment law judge must order an additional
> hearing if a party shows that evidence which was not submitted
> at the hearing: (1) would likely change the outcome of the

---

[1] DEED argues that, based on Erling's own testimony that her process was to complete attestations at the beginning of her Greenlight inspection meetings, Erling submitted a false attestation form every time she did a Greenlight inspection and therefore was not discharged for a "single incident." But the ULJ's decision is based only on the July 2024 incident, and the evidence that DEED relies on for its argument was developed after Erling's discharge and thus cannot have been the basis for the discharge. Thus, the relevant question is whether Erling's July 2024 actions constituted employment misconduct.

decision and there was good cause for not having previously submitted that evidence; or (2) would show that the evidence that was submitted at the hearing was likely false and that the likely false evidence had an effect on the outcome of the decision.

Minn. Stat. § 268.105, subd. 2(c) (2024). "In deciding a request for reconsideration, the ULJ must not consider any evidence that was not submitted at the hearing, except for purposes of determining whether to order an additional hearing." *Id*.

In her request for reconsideration, Erling focused on N.C.'s testimony about the 2019 corrective action involving Erling, stating that Wells Fargo "brought up a past situation/corrective action that [she] believed was removed from [her] file" and that the "two situations were not related." Erling said that she wanted to obtain her personnel file regarding this issue. Erline also argued that, based on the hearing transcript, she "never said [she] attested without being on the call with [her] employee" and argued that attesting at the beginning of the call "was an accepted common practice performed by many of the managers."

The reviewing ULJ affirmed, determining that Erling had not submitted evidence that would likely change the outcome. The affirmation order states, "Any testimony the employer provided about any corrective action in 2019 did not affect the outcome of the decision. The information in Erling's personnel file is irrelevant. Erling's falsification of the [Greenlight] inspection report is employment misconduct regardless of information in her personnel file." The affirmation order also states that "[t]he evidence showed that Erling's conduct in July of 2024, by itself, was intentional conduct that was a serious

violation of the standards of behavior her employer had a right to reasonably expect" and that "[Erling's] arguments would not change the outcome of the decision."

We discern no abuse of discretion in the ULJ's decision. As to the prior corrective action, the ULJ determined that the testimony about that action did not affect the outcome and that information in Erling's personnel file is irrelevant. The ULJ's determination accords with the initial decision, which makes no mention of the 2019 corrective action and focuses entirely on Erling's July 2024 conduct.

As to Erling's other argument, in her appellate brief, Erling asserts that she should be given the opportunity to obtain from Wells Fargo and present at an additional hearing her calendar entries, email that she sent to T. after their meeting, documentation around system timing-out issues, testimony from other managers about standard practice, documentation regarding the closing issue, and Erling's training materials for other managers. But, as the reviewing ULJ determined, Erling does not assert facts that would change the outcome. She does not assert that she actually *did* complete the Greenlight questions with T. And, as discussed above, because Erling knew the required procedures and falsely attested, potential evidence of other employees' misconduct would not change the outcome.

Moreover, Erling does not make a clear argument for good cause for not previously submitting evidence and has not identified evidence that "would show that evidence that was submitted at the hearing was likely false." *See* Minn. Stat. § 268.105, subd. 2(c). We acknowledge that many of the documents related to the investigation are likely in Wells Fargo's possession, making it more difficult for Erling to identify pieces of evidence with

specificity. However, because Erling's argument at the hearing focused on proving that she and T. "met," which is not the relevant inquiry, Erling has failed to identify what additional evidence would change the outcome or that submitted evidence was false.

Finally, Erling argues that, at the time of the hearing and her request for reconsideration, she was not represented by counsel and the ULJ did not adequately assist her. In general, a ULJ is required to "assist all parties in the presentation of evidence," "ensure that all relevant facts are clearly and fully developed," and "exercise control over the hearing procedure in a manner that protects the parties' rights to a fair hearing." Minn. R. 3310.2921 (2023). The record demonstrates that the ULJ met this burden. The ULJ was heavily involved in the hearing. The ULJ repeatedly asked Erling and N.C. to slow down, explain jargon, and further describe Wells Fargo's systems and practices. The ULJ asked follow-up questions to clarify both Erling's and N.C.'s testimonies. The ULJ directly asked N.C. about Wells Fargo's policies and its investigation of Erling's conduct. Accordingly, we discern no abuse of discretion by the ULJ.

**Affirmed.**